**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN GILMORE,
        *Plaintiff-Appellant,*

v.

ALBERTO R. GONZALES, in his
official capacity as Attorney
General of the United States;
ROBERT MUELLER, in his official
capacity as Director of the Federal
Bureau of Investigation; NORMAN
MINETA, in his official capacity as
Secretary of Transportation;
MICHAEL CHERTOFF, in his official
capacity as Secretary of the
Department of Homeland Security;
UAL CORPORATION, aka United
Airlines; SOUTHWEST AIRLINES;
MARION C. BLAKELY, in her official
capacity as Administrator of the
Federal Aviation Administration;
KIP HAWLEY, in his official
capacity as Director of the
Transportation Security
Administration,
        *Defendants-Appellees.*

No. 04-15736

D.C. No.
CV-02-03444-SI

OPINION

Appeal from the United States District Court
for the Northern District of California
Susan Yvonne Illston, District Judge, Presiding

Argued and Submitted
December 8, 2005—San Francisco, California

1135

Filed January 26, 2006

Before: Stephen S. Trott, Thomas G. Nelson, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez

## COUNSEL

William M. Simpich, Oakland, California; James P. Harrison, Sacramento, California, for the plaintiff-appellant.

James P. Rathvon, Piper Rudnick LLP, Washington, D.C.; Jane H. Barrett, Piper Rudnick LLP, Los Angeles, California, for the defendant-appellee Southwest Airlines Co.

Peter D. Keisler, Assistant Attorney General; Kevin V. Ryan, United States Attorney; Douglas N. Letter and Joshua Waldman, Department of Justice, Washington, D.C., for defendants-appellees Alberto R. Gonzales, Attorney General, et al.

Lee Tien and Kurt Opsahl, San Francisco, California, for amicus Electronic Frontier Foundation.

Marc Rotenberg and Marcia Hofmann, Washington, D.C., for amicus Electronic Privacy Information Center.

Deborah Pierce and Linda Ackerman, San Francisco, California; Rachel Meeropol, New York, New York, for amici The Center for Constitutional Rights and Privacy Activism.

Reginald T. Shuford and Catherine Y. Kim, New York, New York; Aaron Caplan, Seattle, Washington; Michael E. Kipling, Summit Law Group, Seattle, Washington, for amici American Civil Liberties Union Foundation and American Civil Liberties Union for Washington.

---

## OPINION

PAEZ, Circuit Judge:

John Gilmore ("Gilmore") sued Southwest Airlines and the United States Attorney General, Alberto R. Gonzales, among other defendants,[1] alleging that the enactment and enforce-

---

[1] Gilmore also named the following federal defendants: Robert Mueller, in his official capacity as Director of the Federal Bureau of Investigation ("FBI"); Norman Mineta, in his official capacity as Secretary of Transportation; Marion C. Blakely, in her official capacity as Administrator of the Federal Aviation Administration ("FAA"); Kip Hawley, in his official capacity as Director of the Transportation Security Administration ("TSA"); and Michael Chertoff, in his official capacity as Secretary of the

ment of the Government's civilian airline passenger identification policy is unconstitutional. The identification policy requires airline passengers to present identification to airline personnel before boarding or be subjected to a search that is more exacting than the routine search that passengers who present identification encounter. Gilmore alleges that when he refused to present identification or be subjected to a more thorough search, he was not allowed to board his flights to Washington, D.C. Gilmore asserts that because the Government refuses to disclose the content of the identification policy, it is vague and uncertain and therefore violated his right to due process. He also alleges that when he was not allowed to board the airplanes, Defendants violated his right to travel, right to be free from unreasonable searches and seizures, right to freely associate, and right to petition the government for redress of grievances.

Before we address the merits of Gilmore's claims, we must consider the jurisdictional and standing issues raised by Defendants. The Government contends that the district court lacked subject matter jurisdiction to entertain this action because, under 49 U.S.C. § 46110(a), Gilmore's claims can only be raised by a petition for review in the courts of appeal. Defendants also contend that Gilmore lacks standing to challenge anything other than the identification policy, such as the Consumer Assisted Passenger Prescreening System ("CAPPS") and so-called No-Fly and Selectee lists. The district court determined that Gilmore had standing to challenge

---

Office of Homeland Security. Where necessary, the current federal defendants have been substituted for the originally named defendants pursuant to Fed. R. Civ. P. 25(d)(1). The federal defendants, including Alberto R. Gonzales, are collectively referred to as "the Government."

Southwest Airlines and the Government are collectively referred to as "Defendants." Gilmore also named United Airlines as a defendant. In dismissing this action against Defendants, the district court also dismissed the complaint against United Airlines without prejudice. United Airlines has not appeared in this court.

only the identification policy, and that it lacked jurisdiction to hear Gilmore's due process challenge.[2] After reviewing the sensitive security information materials that the Government filed with this court *ex parte* and *in camera*, we agree with the Government that the district court lacked jurisdiction and that Gilmore had standing to challenge only the identification policy.

However, as explained below, we transfer Gilmore's complaint to this court pursuant to 28 U.S.C. § 1631 and treat it as a petition for review. Accordingly, we address the merits of each of Gilmore's constitutional claims with respect to the identification policy. We hold that neither the identification policy nor its application to Gilmore violated Gilmore's constitutional rights, and therefore we deny the petition.

## Background

On July 4, 2002, Gilmore, a California resident and United States citizen, attempted to fly from Oakland International Airport to Baltimore-Washington International Airport on a Southwest Airlines flight. Gilmore intended to travel to Washington, D.C. to "petition the government for redress of grievances and to associate with others for that purpose." He was not allowed to fly, however, because he refused to present identification to Southwest Airlines when asked to do so.

Gilmore approached the Southwest ticketing counter with paper tickets that he already had purchased. When a Southwest ticketing clerk asked to see his identification, Gilmore refused. Although the clerk informed Gilmore that identification was required, he refused again. Gilmore asked whether the requirement was a government or Southwest rule, and whether there was any way that he could board the plane

---

[2]The district court did not address the jurisdictional issue as it relates to Gilmore's remaining claims, and instead addressed only the merits of these claims.

without presenting his identification. The clerk was unsure, but posited that the rule was an "FAA security requirement." The clerk informed Gilmore that he could opt to be screened at the gate in lieu of presenting the requisite identification. The clerk then issued Gilmore a new boarding pass, which indicated that he was to be searched before boarding the airplane. At the gate, Gilmore again refused to show identification. In response to his question about the source of the identification rule, a Southwest employee stated that it was a government law. Gilmore then met with a Southwest customer service supervisor, who told him that the identification requirement was an airline policy. Gilmore left the airport, without being searched at the gate.

That same day, Gilmore went to San Francisco International Airport and attempted to buy a ticket for a United Airlines flight to Washington, D.C. While at the ticket counter, Gilmore saw a sign that read: "PASSENGERS MUST PRESENT IDENTIFICATION UPON INITIAL CHECK-IN." Gilmore again refused to present identification when asked by the ticketing agent. The agent told him that he had to show identification at the ticket counter, security checkpoint, and before boarding; and that there was no way to circumvent the identification policy. A United Airlines Service Director told Gilmore that a United traveler without identification is subject to secondary screening, but did not disclose the source of the identification policy. United's Ground Security Chief reiterated the need for identification, but also did not cite the source of the policy. The Security Chief informed Gilmore that he could fly without presenting identification by undergoing a more intensive search, i.e. by being a "selectee." A "selectee" search includes walking through a magnetometer, being subjected to a handheld magnetometer scan, having a light body patdown, removing one's shoes, and having one's carry-on baggage searched by hand and a CAT-scan machine. Gilmore refused to allow his bag to be searched by hand and was therefore barred from flying.

The Security Chief told Gilmore that he did not know the law or government regulation that required airlines to enforce the identification policy. Another member of United's security force later told Gilmore that the policy was set out in government Security Directives, which he was not permitted to disclose. He also told Gilmore that the Security Directives were revised frequently, as often as weekly; were transmitted orally; and differed according to airport. The airline security personnel could not, according to the Government, disclose to Gilmore the Security Directive that imposed the identification policy because the Directive was classified as "sensitive security information" ("SSI").[3] Gilmore left the airport and has not flown since September 11, 2001 because he is unwilling to show identification or be subjected to the "selectee" screening process.

Gilmore filed a complaint against Defendants in the United States District Court for the Northern District of California, challenging the constitutionality of several security measures, which he collectively referred to as "the Scheme," including the identification policy, CAPPS and CAPPS II, and No-Fly and Selectee lists.[4] Gilmore alleged that these government

---

[3]Pursuant to 49 U.S.C. § 114(s)(1)(C) (2005), the Under Secretary of the TSA "shall prescribe regulations prohibiting the disclosure of information obtained or developed in carrying out security . . . if the Under Secretary decides that disclosing the information would . . . be detrimental to the security of transportation." This information is called "sensitive security information." 49 C.F.R. § 1520.5(a) (2005). The Under Secretary classified as SSI "[a]ny security program or security contingency plan issued, established, required, received, or approved by DOT [Department of Transportation] or DHS [Department of Homeland Security], including . . . [a]ny aircraft operator, airport operator, or fixed base operator security program, or security contingency plan under this chapter" and "[a]ny Security Directive or order . . . [i]ssued by TSA." 49 C.F.R. § 1520.5(b)(1)(i), (b)(2)(i) (2005).

[4]The No-Fly and Selectee lists are Security Directives. They were issued by TSA pursuant to 49 U.S.C. § 114(l)(2)(A) (2005), which authorizes the TSA Under Secretary to issue Security Directives without providing notice or an opportunity for comment in order to protect transportation security.

security policies and provisions violated his right to due process, right to travel, right to be free from unreasonable searches and seizures, right to freely associate, and right to petition the government for redress of grievances. Gilmore also alleged that "similar requirements have been placed on travelers who use government-regulated passenger trains, and that similar requirements are being instituted for interstate bus travel." Defendants filed separate motions to dismiss for lack of subject matter jurisdiction under Rule12(b)(1) of the Federal Rules of Civil Procedure and failure to state a claim upon which relief can be granted under Rule 12(b)(6).

The district court dismissed Gilmore's complaint against Defendants with prejudice. Specifically, the district court dismissed Gilmore's due process claim because it determined that the court lacked jurisdiction to hear it. The district court, however, did not assess whether it had jurisdiction to hear Gilmore's other claims. Instead, it reached the merits of those claims and determined that each one failed. In granting Defendants' motions, the court, noting that the identification policy had been classified as SSI, did not review any official documentation of the identification policy. Rather, for purposes of its jurisdictional ruling, the district court assumed, as Gilmore alleged, that the identification policy was a Security Directive issued by TSA. Gilmore timely appealed. Shortly after oral argument in this case, we ordered the Government to file under seal the relevant material pertaining to the identification policy so that we could conduct an *in camera*, *ex parte* review.

## Discussion

## I.  Jurisdiction & Standing

*Jurisdiction*

[1] The Government argues that the district court lacked jurisdiction to hear any of Gilmore's claims because 49

U.S.C. § 46110 divested the court of jurisdiction. The relevant provisions of § 46110 state:

> [A] person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Under Secretary of Transportation for Security . . . or the Administrator of the Federal Aviation Administration . . .) in whole or in part under this part, part B, or subsection (*l*) or (s) of section 114 may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business.
>
> . . . .
>
> . . . When the petition is sent to the Secretary, Under Secretary, or Administrator, the court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the Secretary, Under Secretary, or Administrator to conduct further proceedings.

49 U.S.C. § 46110(a), (c) (2005).[5] Accordingly, whether the district court had jurisdiction over Gilmore's claims turns on

---

[5]In 2003, Congress amended § 46110 to authorize the courts of appeals to review orders issued "in whole or in part under this part, part B, or subsection (*l*) or (s) of section 114." 49 U.S.C. § 46110(a); Pub. L. No. 108-176, § 228, 117 Stat. 2490, 2532 (2003). The prior version restricted the scope of review to orders issued only "under this part." As previously mentioned, TSA can issue Security Directives pursuant to § 114(*l*)(2)(A) "without providing notice or an opportunity for comment." 49 U.S.C. § 114(*l*)(2)(A). Therefore, 49 U.S.C. § 46110(a) allows for courts of appeals to review Security Directives absent prior adjudication. *See*, *Green v. Transp. Sec. Admin.*, 351 F. Supp. 2d 1119, 1125 (W.D. Wash. 2005).

whether the Security Directive that established the identification policy is an "order" within the meaning of this statute.[6] On the basis of Gilmore's allegations, the district court assumed that the identification policy was a Security Directive issued by TSA, and then determined that the Security Directive is an "order." To complete the jurisdictional inquiry, we must also determine whether the Security Directive was issued by an appropriate government official and under a proper authority pursuant to § 46110(a).

"Courts have given a broad construction to the term 'order' in Section 1486(a) [46110's predecessor]." *Sierra Club v. Skinner*, 885 F.2d 591, 592 (9th Cir. 1989). This circuit's case law provides some guidance in defining an "order." As we have explained, finality is key:

> "Order" carries a note of finality, and applies to any agency decision which imposes an obligation, denies a right, or fixes some legal relationship. In other words, if the order provides a "definitive" statement of the agency's position, has a "direct and immediate" effect on the day-to-day business of the party asserting wrongdoing, and envisions "immediate compliance with its terms," the order has sufficient finality to warrant the appeal offered by section [46110].

---

[6] In the district court, the Government "assumed the truth of the content of the identification policy as alleged in Gilmore's complaint" and refused to confirm or deny its existence. In its brief to this court, however, the Government stated that "TSA has now confirmed the existence of an identification requirement — that 'as part of its security rules, TSA requires airlines to ask passengers for identification at check-in.' *Protection of Sensitive Security Information*, 69 Fed. Reg. 28066, 28070-28071 (May 18, 2004)." Moreover, at oral argument, the Government stated that it "accepts as true" that at "the center of this case is a Security Directive." Therefore, we refer to the security measure that imposed the identification policy as a Security Directive, and analyze whether it is an "order" within the meaning of § 46110(a).

*Crist v. Leippe*, 138 F.3d 801, 804 (9th Cir. 1998) (quoting *Mace v. Skinner*, 34 F.3d 854, 857 (9th Cir. 1994)).

[2] Finality is usually demonstrated by an administrative record and factual findings. "The existence of a reviewable administrative record is the determinative element in defining an FAA decision as an 'order' for purposes of Section [46110]." *Sierra Club*, 885 F.2d at 593 (citation omitted). An adequate record, however, may consist of "little more" than a letter. *San Diego Air Sports Ctr., Inc. v. FAA*, 887 F.2d 966, 969 (9th Cir. 1989).[7] As noted, we have reviewed *in camera* the materials submitted by the Government under seal, and we have determined that the TSA Security Directive is final within the meaning of § 46110(a). The Security Directive "imposes an obligation" by requiring airline passengers to present identification or be a "selectee," and by requiring airport security personnel to carry out the policy. The Security Directive also provides a "definitive statement" of TSA's position by detailing the policy and the procedures by which it must be effectuated. Because the Security Directive prevents from air travel those who, like Gilmore, refuse to comply with the identification policy, it has a "direct and immediate" effect on the daily business of the party asserting wrongdoing. Finally, the Security Directive "envisions immediate compliance." Pursuant to TSA regulations, aircraft operators that are required to maintain approved security programs

---

[7]Prior to submitting the sealed materials for our review, the Government argued that an administrative record is not required for § 46110 to apply. The Government cites to *Nevada Airlines, Inc. v. Bond*, 622 F.2d 1017, 1020 (9th Cir. 1980) as support for this proposition. Unlike this case, *Nevada Airlines* dealt with an FAA emergency revocation order, and therefore was not "the ordinary case." *Id.* at 1020. In justifying the narrow scope of review employed in that case, we noted that "[t]his limited standard of judicial review has been consistently applied in evaluating the propriety of *emergency agency action* under other statutory schemes relating to the public safety and welfare." *Id.* at 1020 n.6. (emphasis added). Because we examined the available administrative record of the policy at issue, however, this argument is moot.

"must comply with each Security Directive issued to the aircraft operator by TSA, within the time prescribed in the Security Directive for compliance." 49 C.F.R. § 1544.305(b) (2005).

[3] Therefore, having reviewed the TSA Security Directive that requires airline operators to enforce the identification policy, we hold that it is an "order" within the meaning of § 46110(a). We also determine that the Security Directive was issued by an appropriate government official and under proper authority as required by § 46110(a).[8] Accordingly, the district court lacked jurisdiction to hear challenges to the identification policy.[9]

[4] Although Gilmore should have brought his claims in the court of appeals in the first instance, "Congress has provided a jurisdiction-saving tool that permits us to transfer the case[ ] to this court and consider the petition[ ] as though [it] had never been filed in the district court." *Castro-Cortez v. INS*, 239 F.3d 1037, 1046 (9th Cir. 2001). In an effort to cure jurisdictional defects, 28 U.S.C. § 1631 allows for the transfer of civil actions among federal courts. Section 1631 authorizes

---

[8]We also determine that the Security Directive constitutes SSI pursuant to 49 C.F.R. § 1520.5(b)(2)(i), and therefore it did not have to be disclosed to Gilmore.

[9]Although the Security Directive is an "order" within the meaning of 49 U.S.C. § 46110(a), the district court maintains jurisdiction to hear broad constitutional challenges to Defendants' actions. That is, the district court is divested of jurisdiction only if the claims are "inescapably intertwined with a review of the procedures and merits surrounding the . . . order." *Mace*, 34 F.3d at 858. Gilmore's due process vagueness challenge is "inescapably intertwined" with a review of the order because it squarely attacks the orders issued by the TSA with respect to airport security. Moreover, Gilmore's other claims are as-applied challenges as opposed to broad facial challenges. Given that they arise out of the particular facts of Gilmore's encounter with Southwest Airlines, these claims must be brought before the courts of appeals. *See Tur v. FAA*, 104 F.3d 290, 292 (9th Cir. 1997) (distinguishing between a "facial challenge to agency action" and a "specific individual claim"); *Mace*, 34 F.3d at 859.

transfers to correct jurisdictional problems "only in cases that are actually transferred or are at least transferable." *Clark v. Busey*, 959 F.2d 808, 812 (9th Cir. 1992). That is, we can transfer a civil case to ourselves if "(1) we would have been able to exercise jurisdiction on the date that [it was] filed in the district court; (2) the district court lacked jurisdiction over the case[ ]; and (3) the transfer is in the interests of justice." *Castro-Cortez*, 239 F.3d at 1046 (citing *Kolek v. Engen*, 869 F.2d 1281, 1284 (9th Cir. 1989)).

**[5]** All three of these conditions are met in this case. First, § 46110(a) expressly gives this court jurisdiction to hear Gilmore's claims, given that he is a resident of California and he challenges an "order." Second, as explained above, the district court lacked jurisdiction to entertain Gilmore's claims. Finally, a transfer of this case to our court to cure the lack of jurisdiction is in the interest of justice. Gilmore's claims call into question the propriety of the Government's airline passenger identification policy and implicate the rights of millions of travelers who are affected by the policy. In these unique circumstances, it is of the utmost importance that we resolve Gilmore's claims without further delay. In sum, justice would best be served by transferring Gilmore's district court complaint to this court and treating it as a petition for review under § 1631.

*Standing*

Next, we must address the Government's challenge to Gilmore's standing. Gilmore's claims are not limited to the identification policy. Rather, he challenges a host of practices, which he collectively refers to as "the Scheme." The facts of Gilmore's alleged injury are simple. Gilmore went to Oakland International Airport and San Francisco International Airport to board flights to the east coast. He refused to present identification or undergo a more exacting search, in contravention of the policy, and therefore was not allowed to board his

flights. In light of these facts, Defendants argue that Gilmore has standing only to challenge the identification policy.

[6] Although CAPPS and the No-Fly and Selectee lists are predicated upon the results of the identification policy, i.e. the identity of the passenger, Gilmore's alleged injury stems from the identification policy itself, and does not implicate other security programs that depend upon passenger identification information.

To establish standing, a plaintiff must demonstrate three elements:

> First, plaintiffs must clearly demonstrate that they have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1086 (9th Cir. 2003) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992)). Although Gilmore's complaint describes various airport security programs and policies, the only "injury in fact" that Gilmore alleged was his inability to fly, which clearly stemmed from the identification policy. The fact that the identification policy relates to the other security programs does not mean that Gilmore suffered an "injury in fact" due to these additional programs. Standing, as the Supreme Court stated, "is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).

[7] Gilmore also challenges the alleged identification policies of other modes of travel, specifically the interstate bus

and train systems. Gilmore asserts in his brief to us that he has standing to challenge the Government's identification policies as they relate to other forms of interstate travel because his "right to travel by all modes has been chilled on an ongoing basis—not just in two airports on July 4, 2002." Once again, however, Gilmore fails to establish standing. Gilmore's challenge to the alleged identification systems of other modes of travel is based on one sentence in his fifty-five paragraph complaint. He did not allege that he attempted to board a bus or train, but rather he alleged that he "is also informed and believes and hereby alleges that similar requirements have been placed on travelers who use passenger trains by the government defendants, and that similar requirements are being instituted for interstate bus travel." This sole allegation, however, is insufficient to establish standing. In fine, Gilmore lacks standing to challenge all components of "the Scheme" except the identification policy.

We next turn to the merits of each claim, examining only whether the airline identification policy caused the alleged constitutional violations.

## II.   Due Process

Gilmore alleges that he was penalized for failing to comply with a law that he has never seen. He argues that the Government's failure to provide adequate notice of the law violates his right to due process and renders the law unconstitutionally vague. The district court did not reach the merits of Gilmore's due process claim because it dismissed the claim on jurisdictional grounds.

[8] In support of his vagueness challenge, Gilmore relies principally on *Kolender v. Lawson*, 461 U.S. 352 (1983), in which the Supreme Court held that a California statute was unconstitutionally vague because it did not clarify the requirement that a person who loiters or wanders on the street provide "credible and reliable" identification when requested by

a peace officer. Although the statute was struck down because it was unconstitutionally vague, *Kolender* is easily distinguishable from the present case. The statute in *Kolender*, California Penal Code § 647(e), was penal in nature. In applying the void-for-vagueness doctrine to the statute, the Supreme Court stated that this doctrine "requires that a *penal statute* define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender*, 461 U.S. at 357 (emphasis added). Unlike the penal statute in *Kolender*, the identification policy here does not impose any criminal sanctions, or threats of prosecution, on those who do not comply. Rather, it simply prevents them from boarding commercial flights.

[9] Moreover, Gilmore had actual notice of the identification policy. He alleged that several airline personnel asked him for identification and informed him of the identification policy. They told him that in order to board the aircraft, he must either present identification or be subject to a "selectee" search. He also saw a sign in front of United Airlines' ticketing counter that read "PASSENGERS MUST PRESENT IDENTIFICATION UPON INITIAL CHECK-IN." Although Gilmore was not given the text of the identification policy due to the Security Directive's classification as SSI, he was nonetheless accorded adequate notice given that he was informed of the policy and how to comply. *See Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000) ("[I]ndividuals must be given a reasonable opportunity to discern whether their conduct is proscribed so they can choose whether or not to comply with the law.").

[10] Gilmore also alleges that the Government violated his due process rights because the identification policy vests airline security personnel with unbridled discretion. Upon review of the TSA Security Directive, we hold that the Directive articulates clear standards. It notifies airline security per-

sonnel of the identification requirement and gives them detailed instructions on how to implement the policy. Moreover, because all passengers must comply with the identification policy, the policy does not raise concerns of arbitrary application. For all these reasons, we reject Gilmore's due process arguments.

## III.　Right To Travel

[11] Gilmore alleges that the identification policy violates his constitutional right to travel because he cannot travel by commercial airlines without presenting identification, which is an impermissible federal condition.[10] We reject Gilmore's right to travel argument because the Constitution does not guarantee the right to travel by any particular form of transportation.

Because Gilmore lacks standing to challenge anything but the identification policy's impact on air travel, his sole argument is that "air travel is a necessity and not replaceable by other forms of transportation." Although we do not question

---

[10]Gilmore argues that the identification policy functions as a prior restraint on his ability to travel. Gilmore's argument that we should apply a First Amendment prior restraint analysis is not persuasive. Gilmore cites *Nunez v. City of San Diego*, 114 F.3d 935 (9th Cir. 1997), for the proposition that a First Amendment prior restraint analysis applies to the right to travel context. In *Nunez*, we held that a city juvenile curfew ordinance was unconstitutionally vague and overbroad, violated equal protection, and violated parents' fundamental right to rear their children without undue government interference. The opinion, in addressing a right to travel claim, specifically separated the right to travel discussion from a First Amendment overbreadth claim because "courts have articulated different tests to examine burdens on First Amendment rights and on other fundamental rights." *Id.* at 944 n.6. Moreover, we did not once mention prior restraint in our analysis, but instead applied the overbreadth doctrine. We expressly stated that we did not consider the First Amendment overbreadth challenge based on the right to travel because the "Supreme Court has not applied [the] overbreadth [doctrine] outside the limited context of the First Amendment." *Id.* at 949 n.11.

this allegation for purposes of this petition, it does not follow that Defendants violated his right to travel, given that other forms of travel remain possible.

This circuit's decision in *Miller v. Reed*, 176 F.3d 1202 (9th Cir. 1999), is on point. In *Miller*, the plaintiff challenged California's requirement that applicants submit their social security numbers to the DMV in order to obtain valid drivers licenses. The plaintiff alleged that this policy violated his fundamental right to interstate travel and his right to freely exercise his religion. In affirming the district court's dismissal pursuant to Rule 12(b)(6), we concluded that "by denying Miller a single mode of transportation—in a car driven by himself—the DMV did not unconstitutionally impede Miller's right to interstate travel." *Id.* at 1204. Although we recognized the fundamental right to interstate travel, we also acknowledged that "burdens on a single mode of transportation do not implicate the right to interstate travel." *Id.* at 1205 (citing *Monarch Travel Servs., Inc. v. Associated Cultural Clubs, Inc.*, 466 F.2d 552, 554 (9th Cir. 1972)).

**[12]** Like the plaintiff in *Miller*, Gilmore does not possess a fundamental right to travel by airplane even though it is the most convenient mode of travel for him. Moreover, the identification policy's "burden" is not unreasonable. *See Shapiro v. Thompson*, 394 U.S. 618, 629 (1969) (noting the right of all citizens to be "free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement"), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651, 670-71 (1974). The identification policy requires that airline passengers either present identification or be subjected to a more extensive search. The more extensive search is similar to searches that we have determined were reasonable and "consistent with a full recognition of appellant's constitutional right to travel." *United States v. Davis*, 482 F.2d 893, 912-13 (9th Cir. 1973).

**[13]** In *Davis*, an airline employee searched the defendant's briefcase as part of the airport's preboarding screening procedure. Although we remanded for further consideration of whether the defendant consented to the search, we held that airport screening searches of potential passengers and their immediate possessions for weapons and explosives is reasonable so long as each potential passenger maintains the right to leave the airport instead of submitting to the search. *Id.* at 912. In so holding, we considered several airport screening procedures, including behavioral profiling, magnetometer screening, identification check, and physical search of the passenger's person and carry-on baggage. *Id.* at 900. We see little difference between the search measures discussed in *Davis* and those that comprise the "selectee" search option of the passenger identification policy at hand. Additionally, Gilmore was free to decline both options and use a different mode of transportation. In sum, by requiring Gilmore to comply with the identification policy, Defendants did not violate his right to travel.

## IV.   Fourth Amendment

Gilmore next alleges that both options under the identification policy—presenting identification or undergoing a more intrusive search—are subject to Fourth Amendment limitations and violated his right to be free from unreasonable searches and seizures.

*Request For Identification*

Gilmore argues that the request for identification implicates the Fourth Amendment because "the government imposes a severe penalty on citizens who do not comply." Gilmore highlights the fact that he was once arrested at an airport for refusing to show identification and argues that the request for identification "[i]mposes the severe penalty of arrest." Gilmore further argues that the request for identification violates the Fourth Amendment because it constitutes "a warrantless

general search for identification" that is unrelated to the goals of detecting weapons or explosives.

**[14]** The request for identification, however, does not implicate the Fourth Amendment. "[A] request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *INS v. Delgado*, 466 U.S. 210, 216 (1984). Rather, "[a]n individual is seized within the meaning of the fourth amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. $25,000 U.S. Currency*, 853 F.2d 1501, 1504 (9th Cir. 1988) (internal quotation marks omitted). In *Delgado*, the Supreme Court held that INS agents' questioning of factory workers about their citizenship status did not constitute a Fourth Amendment seizure. In *$25,000 U.S. Currency*, we held that a DEA agent's request for identification from a person waiting to board a flight was not a Fourth Amendment seizure.

**[15]** Similarly, an airline personnel's request for Gilmore's identification was not a seizure within the meaning of the Fourth Amendment. Gilmore's experiences at the Oakland and San Francisco airports provide the best rebuttal to his argument that the requests for identification imposed a risk of arrest and were therefore seizures. Gilmore twice tried to board a plane without presenting identification, and twice left the airport when he was unsuccessful. He was not threatened with arrest or some other form of punishment; rather he simply was told that unless he complied with the policy, he would not be permitted to board the plane. There was no penalty for noncompliance.

*Request To Search*

**[16]** Gilmore argues that the selectee option is also unconstitutional because the degree of intrusion is unreasonable. We reject this argument because it is foreclosed by our decisions in *United States v. Davis*, 482 F.2d 893 (9th Cir. 1973)

and *Torbet v. United Airlines, Inc.*, 298 F.3d 1087 (9th Cir. 2002). The identification policy's search option implicates the Fourth Amendment. *See Davis*, 482 F.2d at 895 (holding that the government's participation in airport search programs brings any search conducted pursuant to those programs within the reach of the Fourth Amendment). Airport screening searches, however, do not per se violate a traveler's Fourth Amendment rights, and therefore must be analyzed for reasonableness. *Id.* at 910. As we explained in *Davis*:

> To meet the test of reasonableness, an administrative screening search must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it. It follows that airport screening searches are valid only if they recognize the right of a person to avoid search by electing not to board the aircraft.

*Id.* at 910-11 (footnotes omitted). Gilmore was free to reject either option under the identification policy, and leave the airport. In fact, Gilmore did just that. United Airlines presented him with the "selectee" option, which included walking through a magnetometer screening device, being subjected to a handheld magnetometer scan, having a light body patdown, removing his shoes, and having his bags hand searched and put through a CAT-scan machine. Gilmore declined and instead left the airport.

[17] Additionally, the search option "is no more extensive or intensive than necessary, in light of current technology, to detect weapons or explosives . . . [and] is confined in good faith to [prevent the carrying of weapons or explosives aboard aircrafts]; and . . . passengers may avoid the search by electing not to fly."[11] *Torbet*, 298 F.3d at 1089 (describing the

---

[11]We recently held in *United States v. Marquez*, 410 F.3d 612, 616 (9th Cir. 2005), that a handheld magnetometer wand scan is no more intrusive and extensive than necessary.

requirements for reasonableness as laid out in *Davis*) (citations omitted). Therefore, the search option was reasonable and did not violate Gilmore's Fourth Amendment rights.

**[18]** Gilmore also suggests that the identification policy did not present a meaningful choice, but rather a "Hobson's Choice," in violation of the unconstitutional conditions doctrine. We have held, as a matter of constitutional law, that an airline passenger has a choice regarding searches:

> [H]e may submit to a search of his person and immediate possessions as a condition to boarding; or he may turn around and leave. If he chooses to proceed, that choice, whether viewed as a relinquishment of an option to leave or an election to submit to the search, is essentially a "consent," granting the government a license to do what it would otherwise be barred from doing by the Fourth Amendment.

*Davis,* 482 F.2d at 913. Gilmore had a meaningful choice. He could have presented identification, submitted to a search, or left the airport. That he chose the latter does not detract from the fact that he could have boarded the airplane had he chosen one of the other two options. Thus, we reject Gilmore's Fourth Amendment arguments.

## V.   Right To Associate and Right To Petition the Government

Finally, Gilmore argues that because the identification policy violates his right to travel, it follows that it also violates his right to petition the government and freely associate. These claims, as Gilmore argued in his appellate brief, are based on the notion that "[f]reedom to physically travel and the free exercise of First Amendment rights are inextricably intertwined." Here, this logic works to Gilmore's detriment. That is, even accepting Gilmore's assertion that there is a connection between the right to travel and First Amendment free-

doms, his argument fails because, as we explained, his right to travel was not unreasonably impaired.

Gilmore argues that the identification requirement impinges his First Amendment right to associate anonymously. In support of this argument he relies principally on *Thomas v. Collins*, 323 U.S. 516, 539 (1945), in which the Supreme Court concluded that a registration requirement for public speeches is "generally incompatible with an exercise of the rights of free speech and free assembly." *Thomas*, however, is easily distinguishable from the present case. Unlike the regulation in *Thomas*, the identification policy is not a direct restriction on public association; rather it is an airline security measure.

**[19]** Further, Gilmore did not allege that he was exercising his right to freely associate in the airport, but rather that he was attempting to fly to Washington, D.C. so that he could exercise his right to associate there. The enforcement of the identification policy did not prevent him from associating anonymously in Washington, D.C. because he could have abided by the policy, or taken a different mode of transport. Although the policy did inconvenience Gilmore, this inconvenience did not rise to the level of a constitutional violation. In the end, Gilmore's free association claim fails because there was no direct and substantial action impairing this right.

**[20]** Gilmore's right to petition claim similarly fails. Although Gilmore did not fly to Washington, D.C., where he planned to petition the government for redress of grievances, the identification policy did not prevent him from doing so. The identification policy is not a direct regulation of any First Amendment expressive activity, nor does it impermissibly inhibit such activity. Gilmore's claims that Defendants violated his rights to associate anonymously and petition the government are without merit.

**Conclusion**

**[21]** In sum, we conclude that Defendants did not violate Gilmore's constitutional rights by adopting and implementing

the airline identification policy. Therefore, his claims fail on the merits and we deny his petition for review.

**TRANSFERRED, PETITION DENIED**.