# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 10, 2025        Decided April 14, 2026

No. 23-1150

SAAD BIN KHALID,
PETITIONER

v.

TRANSPORTATION SECURITY ADMINISTRATION AND DAVID P.
PEKOSKE, ADMINISTRATOR, TRANSPORTATION SECURITY
ADMINISTRATION, IN HIS OFFICIAL CAPACITY,
RESPONDENTS

———

On Petition for Review of an Order of the
Transportation Security Administration

———

*Gadeir I. Abbas* argued the cause for petitioner. With him on the brief was *Lena F. Masri*. *Justin Sadowsky* entered an appearance.

*Joshua P. Waldman*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief were *Sharon Swingle* and *Catherine Padhi*, Attorneys. *Ashley C. Honold*, Attorney, entered an appearance.

Before: HENDERSON, PILLARD and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: Saad bin Khalid, a United States citizen, is on the No Fly List. As a result, he is barred from boarding any planes that fly in U.S. airspace. Believing that placement to be in error, Khalid sought redress through an administrative appeal process run by the Transportation Security Administration (TSA). The TSA Administrator, after reviewing Khalid's submissions and the nonpublic recommendations of the government's Threat Screening Center, determined by order that Khalid should remain on the list.

Khalid now petitions for review of the TSA Administrator's order. He raises statutory and constitutional challenges to his placement on the No Fly List and the adequacy of the redress process. We dismiss one of Khalid's challenges for lack of standing and deny the rest on their merits.

**I.**

**A.**

Congress has charged the Transportation Security Administration to "use information from government agencies to identify individuals on [airline] passenger lists who may be a threat to civil aviation or national security" and, if appropriate, require air carriers to "prevent [such] individual[s] from boarding an aircraft." 49 U.S.C. § 114(h)(3)(A)-(B). In addition, Congress instructed TSA to "establish a procedure to enable airline passengers" who are "prohibited from boarding a flight" because "they might pose a security threat" to "appeal [that threat] determination." *Id.* § 44903(j)(2)(C)(iii)(I).

To carry out those responsibilities, TSA draws on the work of the Threat Screening Center (the Center), a multi-agency body administered by the Federal Bureau of Investigation

(FBI). The Center maintains a centralized database of known and suspected terrorists, collecting and screening nominations from other agencies of individuals to include. That database is commonly known as the terrorist watchlist. The No Fly List is a subset of the terrorist watchlist: The Center adds a No Fly List designation to individuals on the terrorist watchlist if it determines that they meet one of four additional criteria, such as posing "a threat of engaging in or conducting a violent act of terrorism and [being] operationally capable of doing so." *See* Overview of the U.S. Government's Terrorist Watchlisting Process and Procedures as of April 2024 (D.A. 142); McQueen Decl. ¶ 9 (D.A. 116). People included on the No Fly List are prohibited from boarding U.S. commercial aircraft or flying through U.S. airspace.

TSA can remove individuals' No Fly List designations through the Department of Homeland Security Traveler Redress Inquiry Program (DHS TRIP). TSA administers DHS TRIP to respond to individuals' claims that they experienced travel difficulties because they are erroneously treated as No Fly listees. For U.S. citizens and lawful permanent residents, the redress process has several stages. First, TSA seeks confirmation from the Center whether the traveler requesting redress in fact has a No Fly List designation (rather than being stopped for some other reason, such as being mistaken for someone else who has a designation). TSA then sends a letter informing the traveler of his status and offering to provide additional information. Second, if the traveler is on the list and requests more information, TSA works with the Center to prepare an unclassified summary of the evidence supporting his placement. TSA shares the summary with the traveler and invites a response. Third, the Center reviews the response. The Center may remove the traveler's No Fly List designation if it determines that he no longer meets the listing criteria. If, however, the Center determines that the traveler should remain

on the No Fly List, it prepares a recommendation for the TSA Administrator's review. Taking account of the Center's recommendation, the TSA Administrator issues a final order determining whether the person's No Fly List designation should be maintained or removed. **[*Id.*]**

## B.

Saad bin Khalid is a U.S. citizen of Pakistani descent who moved between the United States and Pakistan as a child. He alleges that he was first subjected to enhanced screening in 2012, when he was 16 or 17 years old and sought to board a flight from Pakistan to the United States. After that flight, FBI agents met with Khalid to question him about his activities and contacts in Pakistan. In 2019, when Khalid again made plans to fly from Pakistan to the United States, he was prohibited from boarding his flight and told he could file a redress claim through the DHS TRIP process. He did so. While awaiting a response, he filed suit in the district court challenging, among other things, his maintenance on the No Fly List.

Through DHS TRIP, Khalid received a letter providing an unclassified summary of the FBI's reasons for placing him on the No Fly List. The letter described Khalid as "an individual who represents a threat of engaging in or conducting a violent act of terrorism and [is] operationally capable of doing so." Letter from Stanley Mungaray, Acting Director, DHS TRIP, to Saad bin Khalid (Jan. 25, 2022) (TSA A.R. 64-65).[1] The unclassified summary informed Khalid that "the U.S. Government continue[d] to have concerns about [Khalid's] association with a known terrorist organization" and his

---

[1] Citations to TSA A.R. refer to the material available in the public, redacted version of the TSA Administrative Record. *See infra* II.C.

5

"candor" during the 2012 FBI interview concerning his "contacts and activities in Pakistan from 2008 to 2012." *Id.*

Khalid responded through counsel, stating that he was a minor in 2012 and had been truthful to the best of his recollection in the FBI interview. Letter from Gadeir Abbas to DHS TRIP (Mar. 25, 2022) (TSA A.R. 67-68). Khalid also maintained that he had no association with any foreign terrorists, no wish to harm the United States or engage in terrorism, and no operational capability to do so. *Id.*

Several months later, Khalid received a final decision from the TSA Administrator determining, "based on the totality of available information, including the information [Khalid] provided," that Khalid was "properly included on the U.S. Government's No Fly List." Letter from David P. Pekoske, TSA Administrator, to Saad bin Khalid (June 9, 2022) (TSA A.R. 230). The letter informing Khalid of the decision noted that additional information relevant to the TSA Administrator's order had been withheld to protect information the disclosure of which would risk harm to national security or jeopardize law enforcement activities. *Id.* (TSA A.R. 235-36).

The TSA Administrator then moved to dismiss Khalid's No Fly List claims in district court. The district court concluded that it lacked jurisdiction to review the claims because the order maintaining Khalid's No Fly List designation was reviewable exclusively in this court. The district court transferred Khalid's No Fly List claims to this court pursuant to 28 U.S.C. § 1631.

6

## II.

### A.

We have jurisdiction under 49 U.S.C. § 46110(a) to review the TSA Administrator's order maintaining Khalid on the No Fly List. *Busic v. Transp. Sec. Admin.*, 62 F.4th 547, 549 (D.C. Cir. 2023) (per curiam). When reviewing an order of the TSA Administrator, we ask whether the order is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or unsupported by 'substantial evidence.'" *Suburban Air Freight, Inc. v. Transp. Sec. Admin.*, 716 F.3d 679, 681 (D.C. Cir. 2013) (first quoting 5 U.S.C. § 706(2)(a); and then quoting 49 U.S.C. § 46110(c)). We review constitutional challenges *de novo*. *Jifry v. Fed. Aviation Admin.*, 370 F.3d 1174, 1182 (D.C. Cir. 2004).

### B.

The government contests Khalid's standing in one respect: It argues that Khalid lacks an injury in fact for purposes of his claim under the Religious Freedom Restoration Act (RFRA), Pub. L. No. 103–141, 107 Stat. 1488 (1993) (codified at 42 U.S.C. §§ 2000bb-2000bb-4). We agree.

To show an injury in fact based on a prospect of future harm, a petitioner must demonstrate that "the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)). "Allegations of possible future injury do not satisfy the requirements of [Article] III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

Khalid, a practicing Muslim, asserts that his placement on the No Fly List injures him by burdening his ability to perform

Hajj, an obligatory religious pilgrimage to Saudi Arabia, at some unspecified future time. We do not doubt the sincerity of Khalid's religious beliefs or intention to make Hajj. But Khalid currently resides in Pakistan, Oral Arg. 31:19-31:26, and asserts his RFRA claim "without any description of concrete plans" to travel to Saudi Arabia via U.S. airspace. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992). And he raises no more than a speculative possibility that Saudi Arabia will refuse him entry based on the United States' intelligence. Khalid thus has not shown that he faces an "'actual or imminent' injury" related to his religious exercise. *Id.* He fails to satisfy the minimum constitutional requirement of standing to invoke federal court jurisdiction over his RFRA claim.

## C.

The government filed a redacted version of the administrative record on the public docket. It filed the remainder of the administrative record under seal and *ex parte* and moved to maintain it under seal and *ex parte*. Khalid opposed the *ex parte* motion, seeking access to the portion of the administrative record that remains under seal. We deferred decision on that motion to consider it alongside the merits of Khalid's petition.

"Only in the most extraordinary circumstances does our precedent countenance court reliance upon *ex parte* evidence to decide the merits of a dispute." *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987). We have relied on *ex parte* evidence in merits appeals "upon proper invocation of [a] privilege; a demonstration of compelling national security concerns; and public disclosure by the government, prior to any *in camera* examination, of as much of the material as it could divulge without compromising the privilege," *id.*, including in cases related to aviation safety, *e.g.*,

*Abdellatif v. DHS*, 109 F.4th 562, 570 (D.C. Cir. 2024); *Jifry*, 370 F.3d at 1182; *see Busic*, 62 F.4th at 551 (holding that petitioner lacked a statutory right of access to material that TSA deemed sensitive security information).

Here, the government explains that each portion of the record withheld from the public version is subject to the law enforcement privilege, categorized as sensitive security information by TSA, *Busic*, 62 F.4th at 551, or has been properly classified. As to the first two categories, the Administrator provides detailed declarations identifying the rationales for record materials to remain under seal, the government's efforts to release information where possible, and the national security risks of any further disclosure. *See* Provencio Decl. ¶¶ 5-17 (D.A. 89-96) (law enforcement privilege for Customs and Border Patrol information); Esteves Decl. ¶¶ 3, 7, 12-23 (D.A. 98-100, 102-10) (sensitive security information designation for TSA materials); McQueen Decl. ¶¶ 2, 19-44 (D.A. 113, 122-37) (law enforcement privilege for FBI information).

The Administrator makes no specific representations about the classified material, but we are "in a position to determine whether [information] was properly classified" through our own review. *Jifry*, 370 F.3d at 1182. We do so with respect for the executive branch's "control and responsibility over access to classified information" and its "'compelling interest' in withholding national security information from unauthorized persons in the course of executive business." *People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003) (quoting *Dep't. of the Navy v. Egan,* 484 U.S. 518, 527 (1988)). Having reviewed the non-public portion of the record *in camera*, we grant the government's motion to maintain that portion of the administrative record under seal and *ex parte*.

9

## III.

Khalid argues that the TSA Administrator's order violates his Fifth Amendment rights to substantive and procedural due process as well as the Administrative Procedure Act's proscription of agency actions that are "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). None of his arguments succeeds.

### A.

Khalid first contends that the TSA Administrator's order violates substantive due process by illegitimately restricting his right to free movement. That argument is foreclosed by binding precedent.

Substantive due process protects "fundamental rights" that are so "deeply rooted in our legal tradition" that the government may infringe them only through actions narrowly tailored to serve a compelling government interest. *Washington v. Glucksberg*, 521 U.S. 702, 720-22 (1997). While Americans "enjoy[] 'the right to travel,'" that does not imply "a fundamental right to travel *by airplane*." *Busic*, 62 F.4th at 550 (first quoting *Haig v. Agee*, 453 U.S. 280, 306 (1981); and then quoting *Gilmore v. Gonzales*, 435 F.3d 1125, 1137 (9th Cir. 2006)). Khalid may continue to travel to, from, and inside of the United States by means other than airplanes. As a result, the TSA Administrator's order maintaining Khalid on the No Fly List does not infringe a fundamental right, and Khalid's substantive due process claim fails.

### B.

Khalid next asserts that the TSA Administrator's order prevents his free movement and harms his reputation without constitutionally required procedural due process. "The

fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552 (1965)). To determine whether the government has provided constitutionally adequate process, we weigh (1) "the private interest" at stake, (2) the "risk of an erroneous deprivation of such interest through the procedures used" and the "probable value" of alternate procedural safeguards, and (3) "the Government's interest" in the administrative process and any burdens of providing alternate safeguards. *Jifry*, 370 F.3d at 1183 (quoting *Mathews*, 424 U.S. at 335).

Applying that test, we have previously concluded that TSA through DHS TRIP provides constitutionally adequate process to those on the No Fly List, even considering the significant private interest at stake when the government denies access to air travel. *Busic*, 62 F.4th at 550. "[P]rotecting national security is a government interest of the highest order," and "alternatives to the No Fly List cannot be 100 percent effective against all potential threat[s]." *Id.* (internal quotation marks and citation omitted). Given that other modes of travel remain available to Khalid, the government's national security interest in restricting access to U.S. airspace "outweighs [his] individual travel preferences." *Id.*

Khalid does not tip that balance in his favor by asserting an additional private interest in his reputation. "[I]njury to reputation by itself [is] not a 'liberty' interest protected under the Fourteenth Amendment." *Siegert v. Gilley*, 500 U.S. 226, 233 (1991) (citing *Paul v. Davis*, 424 U.S. 693, 708-09 (1976)). Rather, such injury must be accompanied by the loss or alteration of some "right or status previously recognized by . . . law." *Paul*, 424 U.S. at 711. Khalid cites that standard, Pet'r Br. 18, but fails to argue that, in addition to his claimed

reputational harm from the government's instruction to airlines to refuse him boarding, he was deprived of some recognized right or status that tips his claim into the "stigma-plus" category, *see Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010); *Paul*, 424 U.S. at 708 (explaining that a due process claim was appropriate where the government's stigmatizing action "deprived the individual of a right previously held under state law . . . to purchase or obtain liquor in common with the rest of the citizenry"). Accordingly, Khalid makes no showing that TSA denied him additional process he was due.

## C.

Khalid also challenges the TSA Administrator's order as arbitrary and capricious for want of factual support. *See* 5 U.S.C. § 706(2)(a). To assess that claim, we "consider whether [the agency's] actions were 'based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Jifry*, 370 F.3d at 1181 (quoting *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)). We accept the agency's factual determinations if supported by "substantial evidence," 49 U.S.C. § 46110(c), which "is simply such relevant evidence as a reasonable person might accept as proof of a conclusion," *Jifry*, 370 F.3d at 1181. Because "[c]ourts have limited competence in the area of national security," our "role in reviewing factual determinations in this context is highly deferential." *Busic*, 62 F.4th at 550 (internal quotation marks and citation omitted).

Khalid argues that the TSA Administrator's order was arbitrary and capricious because "there is no appropriate, current evidence that Khalid is a threat to aviation security." Pet'r Br. 56. He asserts that his No Fly List designation and the TSA Administrator's order maintaining him on the No Fly

List "likely" relied on "inherently unreliable statements made by Khalid's estranged mother." *Id.* Khalid also asserts that the No Fly List placement standards themselves are arbitrary insofar as they allow consideration of race, ethnicity, and religion, as well as First Amendment–protected "beliefs and activities." *Id.* at 53. Finally, he contends that the lack of additional process renders the DHS TRIP process arbitrary and capricious. *See id.* at 55.

Given our lack of jurisdiction over the Center when we review a TSA final order resulting from DHS TRIP, *see* 49 U.S.C. § 46110(c), our review is limited to the administrative record before TSA. After reviewing the public and *ex parte* record, we conclude that the TSA Administrator acted with adequate justification when he retained Khalid on the No Fly List. The Administrator's factfinding and analysis closely tracked the Center's recommendation. "Agencies can be expected to 'respect [the] views of such other agencies as to those problems' for which those 'other agencies are more directly responsible and more competent.'" *City of Bos. Delegation v. Fed. Energy Regul. Comm'n*, 897 F.3d 241, 255 (D.C. Cir. 2018) (quoting *City of Pittsburgh v. Fed. Power Comm'n*, 237 F.2d 741, 754 (D.C. Cir. 1956)). Nothing in Khalid's submission rendered it unreasonable for the TSA Administrator to credit the factual analysis of the Center—the entity that oversees a centralized repository of intelligence information, maintains the terrorist watchlist, and makes all No Fly List determinations in the first instance. *Cf. Tarhuni v. Lynch*, 129 F. Supp. 3d 1052, 1057 (D. Or. 2015) (describing plaintiff who received notice that he was on the No Fly List due to the government's "concerns about the nature and purpose of [his] travel to Libya in 2011 and 2012," responded with a detailed description of his activities during that time period, and was then "removed from the No-Fly List" based on information "including [his] submissions to DHS TRIP"),

*rev'd and remanded on other grounds sub nom. Tarhuni v. Sessions*, 692 F. App'x 477 (9th Cir. 2017). Nor did our review of the *ex parte* record otherwise suggest that the TSA Administrator's decision making was arbitrary and capricious or unsupported by substantial evidence. *See City of Kansas City v. Dep't of Hous. & Urb. Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking, and cannot survive review under the arbitrary and capricious standard.").

In the unclassified portion of his final order, the TSA Administrator agrees that placing Khalid on the No Fly List "based upon his status as a young Muslim male with Pakistani roots" would be improper and denies that the order rests on such grounds. David P. Pekoske, TSA Administrator, Notice of Final Order and Decision of the TSA Administrator at 4-5 (June 9, 2022) (TSA A.R. 234-35). And the *ex parte* record confirms that, at least as to Khalid, TSA's actions were based on consideration of relevant, permissible factors.

**D.**

Khalid lastly argues that the No Fly List involves an agency decision of a "major question" without express congressional authorization. Pet'r Br. 45-49. The major questions doctrine does not apply here. Congress has expressly authorized TSA to prevent persons who may pose risks to aviation safety from boarding aircraft.

The Supreme Court has applied the "major questions doctrine," requiring "clear congressional authorization" for an agency to act, in certain "extraordinary cases." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (internal quotation marks and citations omitted). Such cases, the Court instructs, occur when an agency "claim[s] to discover in a long-extant statute an

unheralded power," asserts a "transformative expansion in [the agency's] regulatory authority," addresses an issue of "vast economic and political significance," and adopts a program that "Congress had conspicuously and repeatedly declined to enact itself," among other factors. *Id.* at 716, 724 (internal quotation marks and citations omitted). Under those circumstances, "the history and the breadth of the authority that [the agency] has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *Id.* at 721 (alteration in original) (internal quotation marks and citations omitted).

Khalid primarily appeals to the major questions doctrine to contest the statutory basis for the broader terrorist watchlist. But this petition, brought under our Section 46110(a) jurisdiction, provides no basis to review the actions of the FBI or the Center, which administer the terrorist watchlist. *See Abdellatif*, 109 F.4th at 567-68 (emphasizing that "this court cannot order [the Screening Center] to do anything in the exercise of its § 46110(a) jurisdiction"). As to Khalid's No Fly List challenge, although the No Fly List undoubtedly places a large burden on designated individuals, Khalid fails to show either a major question or a lack of statutory authorization. Congress has authorized TSA to "use information from government agencies to identify individuals . . . who may be a threat to civil aviation or national security" and "prevent [such] individual[s] from boarding an aircraft." 49 U.S.C. § 114(h)(3)(A)-(B). As Khalid acknowledges, Pet'r Br. 48, 52, that provides statutory authority for TSA's use and maintenance of the No Fly List.

## IV.

For the foregoing reasons, we dismiss the petition for review to the extent it raises a claim under RFRA and in all other respects we deny it.

*So ordered.*