Ayman LATIF, Mohamed Sheikh Abdirahm Kariye, Raymond Earl Knaeble IV, Faisal Nabin Kashem, Elias Mustafa Mohamed, Stephen William Washburn, Abdullatif Muthanna, Nagib Ali Ghaleb, Mashaal Rana, Ibraheim Y. Mashal, Salah Ali Ahmed, Amir Meshal, and Stephen Durga Persaud, Plaintiffs,

v.

Eric H. HOLDER, Jr., in his official capacity as Attorney General of the United States; Robert S. Mueller III, in his official capacity as Director of the Federal Bureau of Investigation; and Timothy J. Healy, in his official capacity as Director of the Terrorist Screening Center, Defendants.

No. 3:10–CV–00750–BR.

United States District Court,
D. Oregon.

Aug. 28, 2013.

Stephen M. Wilker, Tonkon Torp LLP, Kevin Diaz, ACLU Foundation of Oregon, Portland, OR, Hina Shamsi, Ben Wizner, Nusrat Jahan Choudhury, American Civil Liberties Union Foundation, Mitchell P. Hurley, Christopher M. Egleson, Justin H. Bell, Akin Gump Strauss Hauer & Feld LLP, New York, NY, Ahilan Arulanantham, Jennifer Pasquarella, ACLU Foundation of Southern California, Los Angeles, CA, Alan L. Schlosser, Julia Harumi Mass, ACLU Foundation of Northern California, San Francisco, CA, Laura Schauer Ives, ACLU Foundation of New Mexico, Albuquerque, NM, Reem Salahi, Salahi Law, Santa Monica, CA, for Plaintiffs.

Eric Holder, United States Attorney General, Diane Kelleher, Lily S. Farel, Amy Elizabeth Powell, Scott A. Risner, United States Department of Justice, Civil Division, Washington, D.C., S. Amanda Marshall, United States Attorney, James E. Cox, Jr., Assistant United States Attorney, Portland, OR, for Defendants.

## OPINION AND ORDER

BROWN, District Judge.

This matter comes before the Court on Defendants' Motion (# 85) for Partial Summary Judgment and Plaintiffs' Cross–Motion (# 91) for Partial Summary Judgment. The parties seek summary judgment on Plaintiffs' claims for procedural due process under the Fifth Amendment of the United States Constitution[1] and the Administrative Procedures Act (APA), 5 U.S.C. § 706, in which Plaintiffs challenge the adequacy of Defendants' redress procedures for persons on the United States government's "No Fly List." The Constitution Project (TCP) filed an Amicus Curiae Brief (# 99) in Support of Plaintiffs' Cross–Motion.

The Court heard oral argument on June 21, 2013. At the conclusion of oral argument the Court requested Defendants to submit additional briefing as to whether any appellate courts have issued opinions on the merits of a challenge brought by a plaintiff who sought review of a final agency decision received through the Department of Homeland Security Traveler Redress Inquiry Program (DHS TRIP). Defendants filed their Notice of Response (# 107) to the Court's Inquiry During Summary Judgment Hearing on July 3, 2013. The Court took the Cross–Motions under advisement on July 3, 2013.

For the reasons that follow, the Court **GRANTS in part** Plaintiffs' Cross–Motion (# 91) as to Plaintiffs' liberty interests in international air travel and reputation and **DENIES in part** Defendants' Motion (# 85) as to the same issues. The Court, however, **DEFERS** ruling on the remaining parts of the pending Motions for the reasons set out herein and directs the par-

---

1. Plaintiffs have also asserted a claim under the Fifth Amendment for violation of substantive due process, which is not at issue for purposes of these Cross–Motions.

ties to submit supplemental briefing in light of the Court's rulings.

## PLAINTIFFS' CLAIMS

Plaintiffs are citizens and lawful permanent residents of the United States (including four veterans of the United States Armed Forces) who were not allowed to board flights to or from the United States or over United States air space. Plaintiffs believe they were denied boarding because they are on a government watch list known as the "No Fly List." Plaintiffs allege some of them have been told by federal and/or local government officials that they are on the No Fly List. Each Plaintiff has submitted applications for redress through DHS TRIP. Despite Plaintiffs' requests to officials and agencies for explanations as to why they were not permitted to board flights, none has been provided and Plaintiffs do not know whether they will be permitted to fly in the future.

In their Third Amended Complaint Plaintiffs allege Defendants have violated Plaintiffs' Fifth Amendment right to procedural due process because Defendants have not given Plaintiffs any post-deprivation notice nor any meaningful opportunity to contest their continued inclusion on the No Fly List. Plaintiffs also assert Defendants' actions have been arbitrary and capricious and constitute "unlawful agency action" in violation of the APA. Plaintiffs seek a declaratory judgment that Defendants' policies, practices, and customs violate the Fifth Amendment of the United States Constitution and the APA and an injunction requiring Defendants (1) to remedy such violations, including removal of Plaintiffs' names from any watch list or database that prevents them from flying; (2) to provide Plaintiffs with notice of the reasons and bases for Plaintiffs' inclusion on the No Fly List; and (3) to provide Plaintiffs with the opportunity to contest such inclusion.

## PROCEDURAL BACKGROUND

Plaintiffs filed this action on June 30, 2010. On May 3, 2011, 2011 WL 1667471, this Court issued an Order (# 69) granting Defendants' Motion (# 43) to Dismiss for failure to join the Transportation Security Administration (TSA) as an indispensable party and for lack of subject-matter jurisdiction on the ground that the relief sought by Plaintiffs could only come from the appellate court in accordance with 49 U.S.C. § 46110(a). Plaintiffs appealed the Court's order to the Ninth Circuit. *Latif v. Holder*, 686 F.3d 1122 (9th Cir.2012).

On July 26, 2012, the Ninth Circuit issued an opinion in which it reversed this Court's decision, holding "the district court ... has original jurisdiction over Plaintiffs' claim that the government failed to afford them an adequate opportunity to contest their apparent inclusion on the List." 686 F.3d at 1130. The Court also held "49 U.S.C. § 46110 presents no barrier to adding TSA as an indispensable party." *Id.* The Ninth Circuit issued its mandate on November 19, 2012, remanding the matter to this Court.

As noted, the parties filed Cross–Motions for Partial Summary Judgment, and the Court heard oral argument on June 21, 2013.

## BACKGROUND

The following facts are undisputed unless otherwise noted:

## I.   The No Fly List

The Terrorist Screening Center (TSC), which is administered by the Federal Bureau of Investigation (FBI), develops and maintains the federal government's consolidated Terrorist Screening Database

(TSDB or sometimes referred to as the watch list). The No Fly List is a subset of the TSDB.

TSC provides the No Fly List to TSA, a component of the Department of Homeland Security (DHS), for use in pre-screening airline passengers. TSC accepts nominations for inclusion in the TSDB, which are generally accepted by TSC because of a "reasonable suspicion" that the individuals are known or suspected terrorists based on the totality of the information reviewed. The federal government does not release its minimum, substantive, derogatory criteria for placement on the No Fly List nor the "Watchlisting Guidance" created for internal use by intelligence and law-enforcement communities.

## II. DHS TRIP Redress Process

DHS TRIP is the mechanism available for individuals to seek redress for any travel-related screening issues experienced at airports or while crossing United States borders; i.e., denial of or delayed airline boarding, denial of or delayed entry into or exit from the United States, or continuous referral for additional (secondary) screening. DHS TRIP allows travelers who have faced such difficulties to submit a "Traveler Inquiry Form" online, by email, or by regular mail. The form prompts travelers to describe their complaint, to produce documentation relating to the issue, and to provide identification and their contact information.

If the traveler is an exact or near match to an identity within the TDSB, DHS TRIP deems the complaint to be TSDB-related and the traveler's complaint is forwarded to TSC Redress for further review.

Upon receipt of the complaint, TSC Redress reviews the available information, including the information and documentation provided by the traveler, and determines (1) whether the traveler is an exact match to an identity in the TSDB and (2) if an exact match, whether the traveler should continue to be in the TSDB. In making this determination, TSC coordinates with the agency that originally nominated the individual to be included in the TSDB. If the traveler is not an exact match to an identity in the TSDB but has been misidentified as someone who is, TSC Redress informs DHS of the misidentification. DHS, in conjunction with any other relevant agency, then addresses the misidentification by correcting information in the traveler's records or taking other appropriate action.

When the review is completed DHS TRIP then sends a determination letter to the traveler advising that DHS TRIP has completed its review. A DHS TRIP determination letter neither confirms nor denies that the complainant is in the TSDB or on the No Fly List and does not provide any further details about why the complainant may or may not be in the TSDB or on the No Fly List. In some cases a DHS TRIP determination provides that the recipient can pursue an administrative appeal of the determination letter with TSA or can seek judicial review in a United States court of appeals pursuant to 49 U.S.C. § 46110.[2]

Determination letters, however, do not provide assurances about the complainant's ability to undertake future travel. In fact, at no point in the available administrative process is a complainant told

---

**2.** 49 U.S.C. § 46110(a) provides in part: "[A] person disclosing a substantial interest in an order issued by the Secretary of Transportation ... in whole or in part under this part ... may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business."

whether he or she is in the TSDB or a subset of the TSDB or given any explanation for his or her inclusion on such a list. Accordingly, there is also not any opportunity for a complainant to contest or to offer corrections to the record on which any such determination may be based.

## III. Plaintiffs

Solely for purposes of the parties' Cross–Motions (# 85, # 91) presently before the Court, Defendants do not contest[3] the following facts as asserted by Plaintiffs:

Plaintiffs are thirteen United States citizens who were denied boarding on flights over United States air space after January 1, 2009, and who believe they are on the United States government's No Fly List. Some Plaintiffs were actually told by airline representatives, FBI agents, or other government officials that they are on the No Fly List.

Each Plaintiff filed DHS TRIP complaints after being denied boarding and received a determination letter. None of the determination letters that Plaintiffs received confirm or deny the existence of any terrorist watch list that includes them nor do any of the letters provide a reason for including the individual in the TDSB or on the No Fly List.

Many of these Plaintiffs cannot travel overseas by any way other than air because such journeys by boat or by land would be cost-prohibitive, would be time-consuming to a degree that Plaintiffs could not take the necessary time off from work, or would put Plaintiffs at risk of interrogation and detention by foreign authorities.

In addition, some Plaintiffs are not physically well enough to endure such infeasible modes of travel.

While Plaintiffs' circumstances are similar in many ways, each of their experiences and difficulties relating to and arising from their alleged inclusion on the No Fly List is unique as set forth in their Declarations filed in support of their Cross–Motion and summarized briefly below.

***Amayan Latif:*** Latif is a United States Marine Corps veteran and lives in Stone Mountain, Georgia, with his wife and children. Between November 2008 and April 2010 Latif and his family were living in Egypt. In April 2010 Latif and his family attempted to return to the United States. Latif was not allowed to board the first leg of their flight from Cairo to Madrid. One month later Latif was questioned by FBI agents and told he was on the No Fly List. Because he was unable to board a flight to the United States, Latif's United States veteran disability benefits were reduced from $899.00 per month to zero because he could not attend the scheduled evaluations required to continue his benefits. In August 2010 Latif returned home after the United States government granted him a "one-time waiver" to fly to the United States. Because he cannot fly, Latif is unable to travel from the United States to Egypt to resume studies or to Saudi Arabia to perform a *hajj*, a religious pilgrimage and Islamic obligation.

***Mohamed Sheikh Abdirahman Kariye:*** Kariye lives in Portland, Oregon with his wife and children. In March 2010 Kariye was not allowed to board a flight from Portland to Amsterdam, surrounded in

---

**3.** As a matter of policy, the United States government does not confirm or deny whether an individual is on the No Fly List nor does it provide any other details as to that issue. Defendants have accordingly chosen not to refute Plaintiffs' allegations that they are on the No Fly List for purposes of these Motions only. The Court, therefore, assumes as true Plaintiffs' assertions that they are on the No Fly List only for purposes of these Cross–Motions.

public by government officials at the airport, and told by an airline employee that he was on a government watch list. Because Kariye is prohibited from boarding flights out of the United States, he could not fly to visit his daughter who was studying in Dubai and cannot travel to Saudi Arabia to accompany his mother on the *hajj* pilgrimage.

*Raymond Earl Knaeble IV:* Knaeble is a United States Army veteran and lives in Chicago, Illinois. In 2006 Knable was working in Kuwait. In March 2010 Knaeble flew from Kuwait to Bogota, Columbia, to marry his wife, a Columbian citizen, and to spend time with her family. On March 14, 2010, Knaeble was not allowed to board his flight from Bogota to Miami. Knaeble was subsequently questioned numerous times by FBI agents in Columbia. Because Knaeble was unable to fly home for a required medical examination, his employer rescinded its job offer for a position in Quatar. Knaeble attempted to return to the United States through Mexico, where he was detained for over 15 hours, questioned, and forced to return to Bogota. Knaeble eventually returned to the United States in August 2010 by traveling for 12 days from Santa Marta to Panama City and then to Mexicali, California. He was detained, interrogated, and searched by foreign authorities on numerous occasions during that journey.

*Faisal Nabin Kashem:* In January 2010 Kashem traveled from the United States to Saudi Arabia to attend a two-year Arabic language-certification program. In June 2010 Kashem attempted to fly from Jeddah, Saudi Arabia, to New York; was denied boarding; and was told by an airline employee that he was on the No Fly List. Kashem was later questioned by FBI agents who also told him he was on the No Fly List. After joining this lawsuit, the United States government of-fered Kashem a "one-time waiver" to return to the United States, which he has so far declined because United States officials have refused to confirm that he will be able to return to Saudi Arabia to complete his studies.

*Elias Mustafa Mohamed:* In January 2010 Mohamed traveled from the United States to Saudi Arabia to attend a two-year Arabic language-certification program. In June 2010 Mohamed attempted to fly from Jeddah, Saudi Arabia, to Washington, D.C., but he was not allowed to board his flight and was told by an airline employee that he was on the No Fly List. He was later questioned by FBI agents who also told him he was on the No Fly List. After joining this lawsuit, the United States government offered Mohamed a "one-time waiver" to return to the United States, which he has so far declined because United States officials have refused to confirm that he will be able to return to Saudi Arabia to complete his studies.

*Steven William Washburn:* Washburn is a United States Air Force veteran and lives in New Mexico. In February 2010 Washburn was not allowed to board a flight from Ireland to Boston. He later attempted to fly from Dublin to London to Mexico City. Although he was allowed to board the flight from Dublin to London, the aircraft turned around 3½ hours after takeoff and returned to London where Washburn was detained. Washburn was subsequently interrogated by FBI agents on numerous occasions. In May 2010 Washburn returned to New Mexico by taking a series of five flights that eventually landed in Juarez, Mexico, where he crossed the United States border on foot. Washburn was subsequently detained and interrogated by Mexican officials. In June 2012 an FBI agent told Washburn that the agent would help remove Washburn's name from the No Fly List if he agreed to

speak to the FBI. Since May 2010 Washburn has been separated from his wife who is in Ireland because she has been unable to obtain a visa to come to the United States and Washburn is unable to fly to Ireland.

*Nagib Ali Ghaleb:* Ghaleb lives in Oakland, California. In February 2010 Ghaleb was traveling from Yemen where his wife and children were living to San Francisco via Frankfurt. Ghaleb was not allowed to board his flight from Frankfurt to San Francisco. Ghaleb was later interrogated by FBI agents who offered to arrange to fly Ghaleb back to the United States if he agreed to tell them who the "bad guys" were in Yemen and San Francisco and to provide names of people from his mosque and community. The agents threatened to have Ghaleb imprisoned. In May 2010 Ghaleb again attempted to return to the United States. He was able to fly from Sana'a, Yemen, to Dubai, but he was not allowed to board his flight from Dubai to San Francisco. In July 2010 Ghaleb accepted a "one-time waiver" offered by the United States government to return to the United States. Because Ghaleb cannot fly, he cannot go to Yemen to be with his ill mother or to see his brothers or sisters.

*Abdullatif Muthanna:* Muthanna lives in Rochester, New York. In June 2009 Muthanna left Rochester to visit his wife and children, who live in Yemen. In May 2010 Muthanna was to return to the United States on a flight from Aden, Yemen, to New York via Jeddah, Saudi Arabia, but he was not allowed to board his flight from Jeddah to New York. In September 2010 Muthanna accepted a "one-time waiver" offered by the United States government to return home. In June 2012 Muthanna wanted to be with his family and attempted to fly to Yemen, but he was not allowed to board a flight departing from New York. In August 2012 Muthanna attempted a thirty-six-day journey over land and by ship from Rochester to Yemen, but a ship captain refused to let Muthanna sail on a cargo freighter departing from Philadelphia on recommendation of United States Customs and Boarder Protection. Muthanna was not allowed to board fights on four separate occasions before finally being able to board a flight from New York to Dubai in February 2013.

*Mashaal Rana:* Rana moved to Pakistan for school in 2009. In February 2010 Rana was not allowed to board a flight from Lahore, Pakistan, to New York. Rana's brother, who lives in the United States, was subsequently interrogated by an FBI agent. In October 2012 Rana was six-months pregnant and again attempted to return to New York to receive needed medical care and to deliver her child. Rana's brother worked with United States officials to clear Rana to fly. Rana received such clearance, but five hours before her flight was to depart she received notice that she would not be allowed to board. Rana was not able to find a safe alternative to travel to the United States prior to the birth of her child. In November 2010 the United States government offered Rana a "one-time waiver," which she has not used because she fears she would not be able to return to Pakistan to be with her husband.

*Ibraheim (Abe) Mashal:* Mashal is a United States Marine Corps veteran. Mashal was not allowed to board a flight from Chicago, Illinois, to Spokane, Washington, and was told by an airline representative that he was on the No Fly List. Mashal was subsequently questioned by FBI agents and told his name would be removed from the No Fly List and he would receive compensation if he helped the FBI by serving as an informant. When Mashal asked to have his attorney present before answering the FBI's ques-

tions, the agents ended the meeting. Mashal owns a dogtraining business. Because he is unable to fly, he has lost clients; had to turn down business; and has been prevented from attending his sister-in-law's graduation, the wedding of a close friend, the funeral of a close friend, and fundraising events for the nonprofit organization that he founded.

*Salah Ali Ahmed:* Ahmed lives in Norcross, Georgia. In July 2010 Ahmed was traveling from Atlanta to Yemen via Frankfurt and was not allowed to board the flight in Atlanta. Ahmed was subsequently questioned by FBI agents. Because he is unable to fly, Ahmed was unable to travel to Yemen in 2012 when his brother died and is unable to travel to Yemen to visit his extended family and to manage property he owns there.

*Amir Meshal:* Meshal lives in Minnesota. In June 2009 Meshal was not allowed to board a flight from Irvine, California, to Newark, New Jersey. Meshal was told by an FBI agent that he was on a government list that prohibits him from flying. In October 2010 FBI agents offered Meshal the opportunity to serve as a government informant in exchange for assistance in removing his name from the No Fly List. Because Meshal is unable to fly, he cannot visit his mother and extended family in Egypt.

*Stephen Durga Persaud:* Persaud lives in Irvine, California. In May 2010 Persaud was not allowed to board a flight from St. Thomas to Miami. An FBI agent told Persaud that he was on the No Fly List, interrogated him, and told him the only way to get off the No Fly List was to "talk to us." In June 2010 Persaud took a five-day boat trip from St. Thomas to Miami and a four-day train ride from Miami to Los Angeles so he could be home for the birth of his second child. Because he cannot fly, Persaud cannot travel to Saudi Arabia to perform the *hajj* pilgrimage.

### STANDARDS

Summary judgment is appropriate when there is not a "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut. Inc. v. United States,* 636 F.3d 1207, 1216 (9th Cir.2011). *See also* Fed. R.Civ.P. 56(a).

The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer v. Verity, Inc.,* 606 F.3d 584, 587 (9th Cir.2010). "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.,* 381 F.3d 948, 957 (9th Cir.2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No.1936,* 680 F.2d 594, 598 (9th Cir.1982)).

### DISCUSSION

As noted, Plaintiffs allege Defendants have violated Plaintiffs' Fifth Amendment right to procedural due process because Defendants have not given Plaintiffs any post-deprivation notice nor any meaningful opportunity to contest their continued inclusion on the No Fly List.

### I. Plaintiffs' Procedural Due–Process Claims

The fundamental requirement of due process is "the opportunity to be heard 'at a meaningful time in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1979). The Supreme Court has set forth a three-factor balancing test for courts to use when evaluating whether the government has provided due process:

(1) the private interest that will be affected by the official action;

(2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;

(3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews,* 424 U.S. at 335, 96 S.Ct. 893.

### A. First Factor: Private Interest

Plaintiffs contend the first factor under *Mathews* has been satisfied because Plaintiffs have a constitutionally-protected liberty interest in travel and reputation. Plaintiffs assert they have been deprived of both by their inclusion on the No Fly List.

### 1. Right to Travel

█ Plaintiffs contend the government has deprived them of their protected liberty interest in travel. In *Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), the Supreme Court held "[t]he right to travel is part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment." *Id.* at 125, 78 S.Ct. 1113.

As noted by the Ninth Circuit, "the [Supreme] Court has consistently treated the right to *international* travel as a liberty interest that is protected by the Due Process Clause of the Fifth Amendment." *DeNieva v. Reyes,* 966 F.2d 480, 485 (9th Cir.1992)(emphasis added)(citing *Aptheker v. Sec'y of State,* 378 U.S. 500, 505–08, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964), and *Califano v. Aznavorian,* 439 U.S. 170, 176, 99 S.Ct. 471, 58 L.Ed.2d 435 (1978)). In DeNieva the plaintiff brought a claim under 42 U.S.C. § 1983 after her passport was seized by government officials. The Ninth Circuit held the plaintiff had a right under the Fifth Amendment to travel internationally, and that right could not be

deprived without a post-deprivation hearing. 966 F.2d at 485.

Although Defendants do not dispute the United States Constitution affords procedural due-process protection to an individual's liberty interest in travel, Defendants rely heavily on *Gilmore v. Gonzales,* 435 F.3d 1125 (9th Cir.2006), and *Green v. Transp. Sec. Admin.,* 351 F.Supp.2d 1119 (W.D.Wash.2005), to support their position that there is not a constitutional right to travel by airplane or to access the most convenient form of travel. In *Gilmore* the plaintiff challenged the government's airline passenger identification policy as unconstitutional, alleging the policy violated his right to travel because he could not travel by commercial airline without presenting identification. The Ninth Circuit rejected plaintiff's argument because "the Constitution does not guarantee the right to travel by any particular form of transportation." 435 F.3d at 1136. The court also found the "burden" imposed by the challenged identification policy was not unreasonable. *Id.* at 1137. The plaintiffs in *Green* alleged they were innocent passengers without links to terrorist activity, but they had names similar or identical to names on the No Fly List and had been mistakenly identified by airport personnel as the individuals whose names appeared on that list. As a result, the plaintiffs were subjected to enhanced security screening. None of the plaintiffs ever missed a flight or were subjected to heightened screening for more than an hour. 351 F.Supp.2d at 1122. The court denied the plaintiffs' procedural due-process claim and held the plaintiffs did not have a right to travel throughout the United States "without any impediments whatsoever." *Id.* at 1130.

The Court finds *Green* and *Gilmore* are distinguishable from this case for a number of reasons. These cases involve bur-

dens on the right to *interstate* travel as opposed to *international* travel. Although there are perhaps viable alternatives to flying for domestic travel within the continental United States such as traveling by car or train, the Court disagrees with Defendants' contention that international air travel is a mere convenience in light of the realities of our modern world. Such an argument ignores the numerous reasons an individual may have for wanting or needing to travel overseas quickly such as for the birth of a child, the death of a loved one, a business opportunity, or a religious obligation. In *Ibrahim v. Department of Homeland Security* the Northern District of California recently rejected an argument similar to the one made by Defendants here:

> While the Constitution does not ordinarily guarantee the right to travel by any particular form of transportation, given that other forms of travel usually remain possible, the fact remains that for international travel, air transport in these modern times is practically the only form of transportation, travel by ship being prohibitively expensive. . . . . Decisions involving domestic air travel, such as the *Gilmore* case, are not on point.

No. C 06–00545 WHA, 2012 WL 6652362, at *7 (N.D.Cal., Dec. 20, 2012). Other cases cited by Defendants on this issue are similarly distinguishable. *See, e.g., Miller v. Reed,* 176 F.3d 1202 (9th Cir.1999)(restrictions on interstate travel as it relates to the right to drive); *Town of Southold v. Town of E. Hampton,* 477 F.3d 38 (2d Cir.2007)(restrictions on interstate travel as it relates to riding ferries); *Cramer v. Skinner,* 931 F.2d 1020 (5th Cir.1991)(restrictions on interstate air service).

In addition, the burdens imposed by the restrictions on the plaintiffs in *Green* and *Gilmore* are far less than the alleged bur-

dens at issue here. While the plaintiffs in *Green* and *Gilmore* faced obstacles before being able to board their flights, they were not completely banned from flying like Plaintiffs in this case. Having to show identification to board a commercial aircraft and undergoing enhanced security screening for less than an hour does not rise to the same level of deprivation as being denied boarding on any flight for the indefinite future. Although Plaintiffs concede the deprivation at issue in this matter may not be as great as that in cases such as *DeNieva* involving the seizure of one's passport, the Court, nevertheless, finds passport-revocation cases more analogous and helpful to the Court's analysis of Plaintiffs' specific circumstances than those cases cited by Defendants in support of their position.

Finally, the bases of the claims asserted in *Green* and *Gilmore* are different than the claims at issue here. In *Green* and *Gilmore* the plaintiffs sought to invalidate the challenged government restriction as *per se* unconstitutional. Here Plaintiffs do not contend the restriction is unconstitutional, but merely assert the burden imposed by the challenged restriction requires a fairer process.

Thus, the Court concludes to the extent that Defendants argue all modes of transportation must be foreclosed before an individual's due-process rights are triggered, such an argument is unsupported. For example, in *DeNieva* the Ninth Circuit found the plaintiff had a protected liberty interest in her right to travel not because she was completely banned from traveling, but rather because "retention of DeNieva's passport infringed upon her ability to travel internationally." 966 F.2d at 485. The court reasoned: "Without her passport, she could travel internationally *only with great difficulty,* if at all." *Id.* (emphasis added). *See also Hernandez v. Cremer,*

913 F.2d 230, 234, 238 (5th Cir.1990)(deprivation of a liberty interest occurred when the United States government restricted the plaintiff's ability to travel to and from Mexico).

Here it is undisputed that inclusion on the No Fly List completely bans listed persons from boarding commercial flights to or from the United States or over United States air space. Thus, Plaintiffs have shown their placement on the No Fly List has in the past and will in the future severely restrict Plaintiffs' ability to travel internationally. Moreover, the realistic implications of being on the No Fly List are potentially far-reaching. For example, TSC shares watchlist information with 22 foreign governments and United States Customs and Boarder Protection makes recommendations to ship captains as to whether a passenger poses a risk to transportation security, which can result in further interference with an individual's ability to travel as evidenced by some Plaintiffs' experiences as they attempted to travel abroad by boat and land and were either turned away or completed their journey only after an extraordinary amount of time, expense, and difficulty.

Accordingly, the Court concludes on this record that Plaintiffs have a constitutionally-protected liberty interest in traveling internationally by air, which is affected by being placed on the No Fly List.

### 2. Stigma–Plus—Reputation

■ Plaintiffs also assert the first factor under *Mathews* has been satisfied because Plaintiffs have been stigmatized "in conjunction with their right to travel on the same terms as other travelers." First Am. Compl. ¶ 141.

■ Under the "stigma-plus" doctrine, the Supreme Court has recognized a constitutionally-protected interest in "a person's good name, reputation, honor, or integrity." *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (U.S.1971). "To prevail on a claim under the stigma-plus doctrine, Plaintiffs must show (1) public disclosure of a stigmatizing statement by the government, the accuracy of which is contested; *plus* (2) the denial of some more tangible interest such as employment, or the alteration of a right or status recognized by state law." *Green*, 351 F.Supp.2d at 1129 (emphasis added)(citing *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 982 (9th Cir.2002), and *Paul v. Davis*, 424 U.S. 693, 701, 711, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)). "The plus must be a deprivation of a liberty or property interest by the state . . . that directly affects the [Plaintiffs'] rights." *Id.* (quoting *Miller v. Cal.*, 355 F.3d 1172, 1178 (9th Cir.2004)). Under the "plus" prong, a plaintiff can show he has suffered a change of legal status if he "legally [cannot] do something that [he] could otherwise do." *Miller*, 355 F.3d at 1179 (discussing *Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971)).

Plaintiffs contend, and Defendants do not dispute, placement on the No Fly List carries with it a stigma of being a suspected terrorist. Defendants, however, argue Plaintiffs cannot meet the "plus" part of the test because (1) Plaintiffs do not have a right to travel by airplane and (2) there is no "connection" here between the stigma and the plus because Plaintiffs have alternative means of travel available.

As noted, the Court disagrees and has concluded Plaintiffs have a constitutionally-protected liberty interest in the right to travel internationally by air. In addition, Plaintiffs have shown the "plus" because being on the No Fly List means Plaintiffs are legally banned from traveling by air at least to and from the United States and over United States air space, which they

would be able to do but for their inclusion on the No Fly List.

Because the Court concludes Plaintiffs have constitutionally-protected liberty interests both in international air travel and reputation, the Court concludes the first factor under the *Mathews* test weighs in Plaintiffs' favor.

## B. Second factor: Risk of Erroneous Deprivation

■ Because Plaintiffs have protected liberty interests under the first *Mathews* factor, the issue becomes whether the current process available to Plaintiffs to contest placement on the No Fly List creates the risk of erroneous deprivation of those interests.

### 1. Notice and Hearing

"For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner." *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972)(internal citations and quotations omitted).

■ Notice is insufficient when an individual does not have adequate information and an opportunity to correct any errors that may have led to the deprivation. *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 982 (9th Cir.2012)("Without knowledge of a charge, even simple factual errors may go uncorrected despite potentially easy, ready, and persuasive explanations."). *See also KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F.Supp.2d 857, 905 (N.D.Ohio 2009)(risk of erroneous deprivation existed when government failed

to provide information about the basis for blocking the plaintiff corporation's assets, which rendered the invitation to submit a letter challenging the action futile because the challenge could be neither comprehensive nor successful); *Gete v. I.N.S.*, 121 F.3d 1285, 1298 (9th Cir.1997)(INS procedures following vehicle seizures violated procedural due process when INS did not provide post-seizure its legal and factual basis for the seizure, "copies of [the] evidence to be used against [the plaintiffs]," and "statements of the reasons for its denials of relief.").

In some cases a post-deprivation hearing may be sufficient to satisfy the hearing requirement, but "under no circumstances has the Supreme Court permitted a state to deprive a person of a life, liberty, or property interest under the Due Process Clause without any hearing whatsoever." *DeNieva*, 966 F.2d at 485 (citations omitted).

Plaintiffs argue the redress process available here is insufficient and does not provide the basic process that is due. Plaintiffs contend they are entitled to (1) a post-deprivation notice setting forth the government's reasons for placing Plaintiffs on the No Fly List in sufficient detail to allow Plaintiffs to put forward a defense and (2) a post-deprivation hearing at which Plaintiffs can meaningfully contest their placement on the No Fly List.

It is undisputed that a DHS TRIP complainant is never informed of the specific reasons for inclusion on the No Fly List. In fact, Defendants acknowledge the government's policy is never to confirm or to deny an individual's placement on the No Fly List. It is also undisputed that the current process does not provide a hearing at which an individual can present evidence to contest his or her inclusion on the No Fly List. Plaintiffs assert this process

is constitutionally deficient and creates a high risk of "erroneous deprivation" of their constitutional rights because they cannot provide the evidence necessary to clear up any errors without knowing why they are on the No Fly List. Plaintiffs contend this risk is compounded by the fact that they are not permitted to have a hearing to confront and to rebut the bases for their inclusion on the No Fly List.

As noted, Defendants do not dispute the notice sought by Plaintiffs is neither given before an individual is placed on the No Fly List nor after the individual seeks redress through DHS TRIP. Defendants instead contend the DHS TRIP process is all that Plaintiffs are due in light of the government's interest in national security. Defendants argue they are not required to provide Plaintiffs with information about their alleged status on the No Fly List or an opportunity to contest that placement because providing such information would require Defendants to reveal classified information, which they cannot do. Defendants also assert they are not required to provide an opportunity for Plaintiffs to confront or to rebut the grounds for inclusion on the No Fly List because confrontation and rebuttal are not absolute requirements for all government proceedings, especially in cases where the information at issue is highly sensitive to national security. *See Jifry v. F.A.A.,* 370 F.3d 1174, 1183 (D.C.Cir. 2004)("In light of the governmental interests at stake and the sensitive security information, substitute procedural safeguards may be impracticable, and in any event, are unnecessary under our precedent.").

Defendants contend the current redress process is a "suitable substitute" for an evidentiary hearing because DHS TRIP allows a complaint to be filed, the complaint to be reviewed, and judicial review by the court of appeals for those who are dissatisfied with the results. Defendants argue this process achieves an appropriate balance by providing an opportunity for review of any alleged delay or denial of boarding on a flight without requiring the government to reveal sensitive or classified information.

**2. Accuracy and Quality Assurances**

Defendants contend the current redress process is adequate because there is little risk of erroneous deprivation of an individual's constitutional rights as a result of the quality controls in place to monitor the contents of the TSDB and the names included on the No Fly List. For example, (1) the TSDB is updated daily, (2) the TSDB is reviewed and audited on a regular basis to comply with quality-control measures, and (3) nominations to the No Fly List are reviewed by TSC personnel to ensure they meet the required criteria.

Plaintiffs and TCP counter Defendants' contentions by arguing the adequacy of the DHS TRIP front-end procedures is disputed by government reports and audits that document errors on the watch list from which the No Fly List is compiled. For example, in a 2009 audit report, the Department of Justice Office of Inspector General (DOJ OIG) concluded the "FBI did not update or remove watch list records as required." Choudhury Decl., Ex. F at iv. In that report DOJ OIG also found the FBI failed to (1) timely remove records in 72 percent of cases where it was necessary, (2) modify watch-list records in 67 percent of cases where it was necessary, and (3) remove terrorism case classifications in 35 percent of cases where it was necessary. *Id.* at iv-vi.

In *Ibrahim v. Department of Homeland Security,* the Ninth Circuit reviewed other governmental reports regarding the TSDB and noted similarly troubling deficiencies:

In theory, only individuals who pose a threat to civil aviation are put on the No–Fly and Selectee Lists, but the Justice Department has criticized TSC for its "weak quality assurance process." ... Tens of thousands of travelers have been misidentified because of misspellings and transcription errors in the nomination process, and because of computer algorithms that imperfectly match travelers against the names on the list. TSA maintains a list of approximately 30,000 individuals who are commonly confused with those on the No–Fly and Selectee Lists. One major air carrier reported that it encountered 9,000 erroneous terrorist watchlist matches every day during April 2008.

669 F.3d 983, 990 (9th Cir.2012) (citations omitted).

Citing to government reports from 2007 and 2012,[4] Defendants argue the reports relied on by Plaintiffs and TCP are outdated and not an accurate portrayal of the current TSDB process as recent improvements have helped reduce the amount of errors associated with the process. Plaintiffs and TCP contend, however, even these more recent improvements have not addressed or corrected the risk shown here; *i.e.*, being placed on the No Fly List in error.

### 3. Availability of Judicial Review

Defendants argue judicial review by a court of appeals under 49 U.S.C. § 46110 is adequate due process for those who are dissatisfied with the DHS TRIP redress process as it sufficiently balances the government's interest in security and an individual's constitutional rights. Plaintiffs, however, argue because of the lack of information contained in the DHS TRIP determination letters, they "do not know what to appeal, whether to appeal, or how best to advocate for themselves on appeal." Pls.' Am. Memo. in Opp'n (# 98–2) to Defs.' Mot. for Partial Summ. J. at n. 37. Although this issue was raised by the parties in their briefing, it was not addressed in detail.

At oral argument Defendants explained the government files an administrative record and other materials *ex parte* and *in camera* with the appellate court as part of the judicial-review process. This Court does not have any other information about the review process such as what specifically would be in the administrative record submitted to the appellate court, what other materials might be submitted, or the nature of the record or materials that deems them sensitive and/or classified so they cannot be revealed to anyone other than the appellate court.

At oral argument the Court requested Defendants to submit additional briefing as to whether any appellate courts have issued opinions on the merits of a challenge brought by a plaintiff who sought review of a final agency decision reached through the DHS TRIP process. Defendants advise "no appellate court has issued a decision on the merits of such a challenge," but Defendants note there are currently three such cases pending in the Ninth Circuit and the District of Columbia Circuit: *Arjmand v. TSA*, No. 12–71748 (9th Cir.); *Ege v. DHS*, No. 13–1110 (D.C.Cir.); and *Kadirov v. TSA*, No. 10–1185 (D.C.Cir.).

As noted, the DHS TRIP process, at least through the determination-letter

---

**4.** *See* United States Department of Justice, Office of the Inspector General, Audit Division, Audit Report 07–41, *Follow–Up Audit of the Terrorist Screening Center* (2007); United States Government Accountability Office, GAO–12–476, *Terrorist Watchlist: Routinely Assessing Impacts of Agency Actions Since the December 25, 2009, Attempted Attack Could Help Inform Future Efforts* (2012).

step, does not provide Plaintiffs with either post-deprivation notice nor a hearing. Plaintiffs have not been officially provided with any information about why they are not allowed to board commercial flights; they have not been officially informed whether they are on the No Fly List; if they are on the No Fly List, they have not been provided with an opportunity to contest their placement on the list; and they have not been provided with an in-person hearing. The question remains, however, whether, as Defendants contend, judicial review of the record on which the government acted as to each Plaintiff is sufficient to satisfy the requirements of due process and to avoid the risk of erroneous deprivation. The Court concludes the current record in this case is not sufficiently developed as to the judicial-review process for the Court to resolve this question on the parties' Cross–Motions or on this record.

### C. Third Factor: Government's Interest

The third and final *Mathews* factor requires the Court to weigh the government's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335, 96 S.Ct. 893.

Defendants again argue the DHS TRIP process, including the availability of judicial review, is adequate in light of the government's "paramount interest in ensuring that TDSB information can be broadly shared across the government to maximize the nation's security, without fear that such information will be disclosed whenever anyone cannot travel as he or she might choose." Defs.' Reply Memo. (# 102) in Supp. of Defs.' Mot. for Summ. J. at 19.

Because the record is not sufficiently developed for the Court to assess fully the second factor of the *Mathews* balancing test with respect to the judicial-review process, the Court is unable to evaluate the third factor as well. In other words, the Court does not yet have a sufficiently developed record to weigh the government's interests against the current review process that is available to Plaintiffs in order to determine whether additional or alternative procedural requirements are necessary or possible.

### II. Plaintiffs' APA Claims

■ Plaintiffs also challenge Defendants' actions under the APA on two separate theories: (1) Defendants' failure to afford United States citizens on the No Fly List meaningful notice and a hearing violates due process and is "contrary to constitutional right, power, privilege, or immunity" under APA § 706(2)(B) and (2) Defendants' redress procedures are arbitrary and capricious under APA § 706(2)(A).

In light of the Court's ruling as to Plaintiffs' procedural due-process claims, the Court defers ruling on the parties' Cross–Motions as to Plaintiffs' APA claims at this time because the Court is not yet able to resolve on the current record whether the judicial-review process is a sufficient, post-deprivation process under the United States Constitution or the APA.

### CONCLUSION

For these reasons, the Court **GRANTS in part** Plaintiffs' Cross–Motion (# 91) as to Plaintiff's liberty interests in international air travel and reputation, **DENIES in part** Defendants' Motion (# 85) as to the same issue, and **DEFERS** ruling on the remaining parts of the pending Cross–Motions.

The Court also directs the parties to confer and to submit a joint status report

no later than September 9, 2013, setting out their recommendation as to the most effective process to better develop the record so that the Court may complete its consideration of the still-pending Motions (# 91, # 85) and specifically setting out any additional issues that the parties believe need to be resolved on the existing Cross–Motions in light of the Court's rulings herein.

IT IS SO ORDERED.